**Dated: December 29, 2017**

**The following is ORDERED:**



*Tom R. Cornish*
TOM R. CORNISH
UNITED STATES BANKRUPTCY JUDGE

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

In Re:
ELSIE MARIE COSTIGAN,   Case No: 16-80272-TRC
                        Chapter 7

    Debtor.

AVB BANK,

    Plaintiff

v.   Adv. No. 16-8013-TRC

ELSIE MARIE COSTIGAN,

    Defendant.

### MEMORANDUM OPINION

Plaintiff AVB Bank ("AVB") seeks a determination that Defendant Elsie Marie Costigan's debts to it are excepted from discharge pursuant to 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6). A trial on the merits was held jointly with AVB's adversary case against Costigan's ex-husband, Stephen L. Costigan, Adv. Case No. 16-8019-TRC. After careful review of the

testimony and exhibits admitted, as well as the relevant legal arguments and authority, the Court finds that AVB has not met its burden of proof, and has failed to establish that Elsie Costigan's debt to it should be excepted from her discharge.

**Jurisdiction**

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

**Findings of Fact**

After weighing the evidence, stipulations of the parties, and considering the credibility of the witnesses, the Court makes the following findings of fact.

Elsie Costigan was married to Stephen Costigan for nearly thirty years. Stephen worked in a variety jobs, including working offshore for Exon Mobil, competing as a professional fisherman on the bass tournament circuit, operating a small business from their garage, and working for a manufacturing business. Elsie Costigan worked in offices of a millwork company and a manufacturing company. She also obtained a real estate license. In 2002 or 2003, the Costigans began SC Piping & Mechanical, Inc. ("SC Piping"), a manufacturing business that fabricated boilers and heat exchangers for the petrochemical and oil and gas industries. SC Piping's customers included Exon Mobil, General Chemical, Citgo, Zeeco, John Zink, and many others. Its corporate office was located in Wagoner, Oklahoma. Stephen Costigan was president. Elsie Costigan was secretary and vice-president. Eventually, they each became 50/50 owners of SC Piping. Stephen and Elsie performed many duties for SC Piping. Stephen made contacts with customers, prepared quotes and bids for projects, and oversaw manufacturing work. Elsie

managed the business office, prepared invoices, oversaw human resources issues, kept daily books and records using QuickBooks accounting software, and assembled financial records for SC Piping's accountants. During the height of its operations, SC Piping had approximately 55 employees. In 2012, SC Piping had income of $2,517,142; in 2013 its income dropped to $1,574,145; and by 2014 it had decreased to $500,408.41. The Costigans also operated a related business, SC Enterprises, which was founded in 2007 or 2008 to manufacture fittings for the oil and gas industry. SC Enterprises was sold to CWH Resources, Inc. prior to the bankruptcy and appointment of a receiver for SC Piping.

SC Piping borrowed money from various banks, including AVB. The earliest record presented to the Court of an AVB loan to SC Piping is from 2004. Two loans are at issue in this case. One promissory note and commercial security agreement was executed April 21, 2010 for $396,787.49. These funds were borrowed so that SC Piping could enlarge its manufacturing facility. The other note and commercial security agreement was executed March 29, 2012 for $486,917.80. These funds were used to purchase equipment from a company that was going out of business. SC Piping also used funds from both loans for general operations. AVB perfected its security interest by filing UCC-1 financing statements with the Oklahoma County Clerk. Stephen and Elsie each personally guaranteed SC Piping's obligations under the notes and commercial security agreements. AVB's representative, Brian Ferrell, testified that at the time the loans were made, the value of the collateral securing the promissory notes was sufficient to fully secure the SC Piping's loans.

AVB's loans were made on the basis of financial statements of SC Piping, as well as personal financial statements submitted by the Costigans. The commercial security agreements granted AVB a security interest in all accounts, equipment, inventory, and general intangibles

then owned or acquired later, including monies arising from the sale of collateral ("the collateral"). These agreements also prohibited borrowers from disposing of collateral without AVB's consent, and provided that "all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; . . . ." Elsie Costigan understood this to mean that AVB had a blanket lien on all assets of SC Piping, or, as she described it, an "umbrella" on anything and everything, and that she personally guaranteed SC Piping's debt and its duties owed to AVB. When she signed the notes, commercial security agreements and personal guaranty, she intended and expected to pay AVB in full for all monies borrowed, had no intention to harm AVB, and believed that SC Piping's assets were of sufficient value to fully secure the note. SC Piping made timely payments to AVB for many years.

In November of 2013, AVB hired Dakil Auctioneers, Inc. to inspect and appraise the equipment and furnishings located at SC Piping's building on South Main St., in Wagoner. Dakil prepared a ten page inventory of the equipment, and appraised the inventory at $ 300,000. Stephen was not present when Louis Dakil inspected and photographed the equipment. Stephen believed that some of the items Dakil listed were not actually owned by SC Piping but were owned by SC Enterprises.

By 2014, the Costigan's business and marriage began to collapse. Business income was insufficient to make timely payments on SC Piping's debt to AVB. Elsie sent checks on behalf of SC Piping when funds were available, but these payments were late, and SC Piping defaulted on its obligations to AVB on May 14, 2014. On June 11, 2014, AVB filed a foreclosure action in Wagoner County, Oklahoma District Court, Case No. CJ 2014-0203, against SC Piping and the

Costigans individually, and requested the appointment of a receiver. On June 19, 2014, the Costigans divorce decree was entered and the marital property was divided between them.

SC Piping filed a chapter 11 bankruptcy in this district on July 24, 2014, which stayed the state court action. SC Piping's bankruptcy was dismissed August 27, 2014, and the state court action resumed. On September 29, 2014, the motion to appoint a receiver was granted. On October 7, 2014, Bill Koehler was appointed as receiver for SC Piping, taking control of the business operations, real and personal property. Koehler had scheduled a family vacation to begin the day after his appointment, but he was able to make a general inspection of SC Piping's facility in Wagoner before leaving on vacation. He met with Stephen and Elsie and instructed them to cease any operations they were involved in, took pictures of equipment, and took control of the books and records and computers. Elsie informed him that the utilities were in imminent danger of being cutoff for nonpayment. Koehler opened a new utilities account in order to continue utility services to SC Piping's facility. He determined that no workers' compensation or general liability insurance was in place, and that there were no pending work orders or accounts receivable. Stephen informed Koehler that SC Piping was finishing a job consisting of manufacturing pipe flanges. Koehler understood that a separate operation had rented part of SC Piping's building and was working on the pipe flanges project. Koehler allowed that operation to continue until he returned from vacation the following week. He did not authorize anyone to remove equipment from the SC Piping premises.

While Koehler was vacationing out of state, the utilities were cutoff to the SC Piping building. Since Koehler had given permission for the pipe flange project to continue, Stephen took it upon himself to move SC Piping equipment from its premises to another building on the south side of Wagoner on Highway 69 so that the project could be completed. Once Koehler

returned from vacation and visited SC Piping, he realized equipment was missing. Persons affiliated with SC Piping confirmed to Koehler that Stephen had removed equipment. Stephen did not notify Koehler that he had removed the equipment nor where he had it moved. Koehler found the missing equipment by following Stephen (without Stephen's knowledge) to the new location. Koehler enlisted the help of police officers to inspect the Highway 69 premises for the missing equipment. Stephen filed a motion to remove Koehler as receiver. The state court denied his motion to remove Koehler, directed Stephen to turnover the equipment that had been removed, and enjoined him from removing any equipment. Koehler hired a heavy equipment mover to move one large piece of equipment back to SC Piping's building, and hired two individuals to move back the rest of the equipment. He believed that not all equipment was located and returned to SC Piping, and identified a 2006 cargo mate trailer purchased with SC Piping funds, and two flat-bed trailers with "SC Piping" painted on the sides that were never recovered. Koehler changed all the locks on the SC Piping building.

      In reviewing the books and records of SC Piping, Koehler found that the Costigans operated several businesses, including SC Enterprises and SC Fabrication, as well as SC Piping, but did little to keep those businesses separate. He found the business records to be in disarray, and believed that the business records were designed to hide the true operations of the businesses. The accounting system was corrupted and he was required to hire an IT professional to recover business records. He described the Costigans as hostile and uncooperative.

      Elsie disputed Koehler's description of SC Piping's books and records. She kept the records using QuickBooks software so that transactions would be well-documented and in proper format for SC Piping accountants. She did not know that Stephen was going to remove equipment from SC Piping. She did not learn that Stephen had removed equipment from SC

Piping and moved it to the Highway 69 location until after Koehler learned about this information. She admitted that she did not inform AVB or Koehler that Stephen had removed equipment nor where it was located. However, she did not consider it her responsibility to inform AVB once Koehler was appointed as receiver, and because Koehler already knew that the collateral had been removed and where it was located. She believed that once Koehler took over and ordered her to cease and desist from performing any further operations on behalf of SC Piping, she no longer had the ability or responsibility to perform her duties for SC Piping nor marshal assets. All she believed she was responsible for at that point was payment on her personal guaranty. She denied taking any actions in an effort to protect Stephen. She also denied removing or selling any of AVB's collateral.

AVB's judgment against SC Piping and the Costigans totaled approximately $ 1.2 million. Koehler sold SC Piping property and collected approximately $ 181,000 to be applied to AVB's judgment. Elsie Costigan filed chapter 7 bankruptcy on March 28, 2016, and listed her debt to AVB as $ 967,258. Stephen Costigan filed his own chapter 7 case on June 11, 2016.

**Conclusions of Law**

Exceptions to discharge are narrowly construed in favor of the debtor. The standard of proof required of a creditor seeking to except a debt from discharge is preponderance of the evidence.[1]

**I.       Exception to discharge pursuant to 11 U.S.C. § 523(a)(2)(A)**

To establish that a debt is nondischargeable under § 523(a)(2)(A) the creditor must prove: (1) the debtor made a false representation; (2) the debtor made the representation with the intent

---

[1] *Grogan v. Garner*, 498 U.S. 279 (1991).

to deceive the creditor; (3) the creditor relied on the representation; (4) the creditor's reliance was reasonable; and (5) the debtor's representation caused the creditor to sustain a loss.[2] AVB alleges that Elsie induced it to loan money to SC Piping by promising not to sell, transfer or conceal collateral, then failing to inform AVB when Stephen moved collateral to the Highway 69 location. The Court finds no proof of the first two elements. When Elsie signed the loan documents as an officer of SC Piping and a guarantor of its debt, times were good. AVB admitted that the loans were fully secured by the collateral. SC Piping made timely payments in full for years until early 2014. Elsie stated that she fully intended to comply with the terms of the loan agreements when the money was borrowed, and she did comply. There was no evidence that she obtained funds from AVB under false pretenses or fraud, that she never intended to comply with terms of the loan documents, that she concealed any information about the collateral, the financial condition of SC Piping, her or Stephen, or that she had any motivation or intent to deceive AVB. She readily acknowledged under oath that AVB had a lien on all of SC Piping's assets. There was no evidence that Elsie disposed of or diverted collateral pledged to AVB prior to the appointment of the receiver in the fall of 2014.

Further, the Court finds that Elsie did not deceive AVB regarding the removal of the collateral after the appointment of the receiver. She testified that she did not find out that Stephen removed equipment until after Koehler found out. It would be difficult to deceive AVB regarding something of which she had no notice or knowledge. She also had been told by Koehler to "cease and desist" all operations on behalf of SC Piping, and she did so. She had no access to SC Piping's books and records and was unable to perform any work. She had no reason to go to SC Piping's office, and rightly believed that she should not be on the premises.

---

[2] *Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1373 (10th Cir.1996).

She and Stephen were recently divorced, and she stated that she had no plan nor to deceive AVB in an effort to protect her ex-husband. The Court finds her testimony to be credible. The Court finds that AVB has not met its burden of proof to except its claim from discharge pursuant to § 523(a)(2)(A).

## II. Exception to discharge pursuant to 11 U.S.C. § 523(a)(4)

Section 523(a)(4) prevents an individual debtor from discharging any debt for fraud or defalcation while acting in a fiduciary capacity, or for embezzlement, or larceny. To establish a claim under this section, AVB must show two things: 1) the existence of a fiduciary relationship between itself and the debtor, and 2) a defalcation committed by the debtor in the course of that fiduciary relationship.[3] Such debts must have been incurred with intentional wrongful conduct, bad faith, moral turpitude, or other immoral conduct.[4] The Tenth Circuit narrowly construes the phrase "fiduciary capacity" in 523(a)(4).[5] The requisite fiduciary relationship exists only where there is an express or technical trust, not a constructive trust or one implied by law or contract.[6] And, a fiduciary relationship must exist before creation of the debt. A general fiduciary duty of confidence, trust, loyalty, and good faith is insufficient to establish a fiduciary relationship for purposes of dischargeability.[7]

Ordinarily, the existence of a fiduciary relationship is a threshold issue. However, the Court need not answer the question of whether Elsie had a fiduciary duty to AVB, because even

---

[3] *Id.* at 1371.

[4] *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 273–74 (2013).

[5] *Young,* 91 F.3d at 1371-72.

[6] *Id.*

[7] *Id.* at 1372 (citations omitted).

if such duty is presumed, AVB has not met its burden to establish the other half of a 523(a)(4) claim based on defalcation. According to *Bullock*, AVB must prove that Elsie's conduct involved intentional wrongful conduct, bad faith, moral turpitude, or other immoral conduct.[8] Her actions must be "*a gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation."[9] The actions AVB alleges to fit this standard occurred after the receiver was appointed: Elsie's failure to stop her ex-husband from removing equipment from SC Piping's premises and her failure to inform AVB that the equipment had been removed. The Court finds that this conduct does not meet the standard for nondischargeability under §523(a)(4). The Court believes Elsie's testimony that she did not know that her ex-husband removed equipment until after the receiver discovered this and had already taken steps to recover the equipment. She was not present when the equipment was removed, which was several days after she was told to cease and desist. She could not have stopped the removal of equipment when she did not know about it. The evidence also clearly established that when SC Piping borrowed money and Elsie and Stephen personally guaranteed the debts of SC Piping, they did so in good faith, and faithfully made payments to AVB. There is no evidence that Elsie breached a fiduciary duty by intending to harm AVB, that she acted in bad faith or with recklessness or for any immoral purpose in her dealings with AVB or the receiver. Furthermore, once the receivership was in place, Elsie was ordered to "cease and desist" from performing any duties for SC Piping. Elsie no longer had the ability to utilize the computers, books and records of the business. Therefore, the Court finds that AVB failed to sustain its burden to find Elsie's debt nondischargeable under § 523(a)(4).

---

[8] *Bullock*, 569 U.S. at 273–74.

[9] *Id.* at 274 (citations omitted; emphasis in original).

### III. Exception to discharge pursuant to 11 U.S.C. § 523(a)(6)

Section 523(a)(6) excepts from discharge any debt for "willful and malicious injury by the debtor to another entity or to the property of another entity." A creditor must prove that the debtor intended the injury that occurred, not just intend the act that leads to the injury.[10] Proof of both a willful act and a malicious injury is required to establish nondischargeability under § 523(a)(6).[11] Under certain circumstances, conversion may give rise to a nondischargeable debt pursuant to § 523(a)(6).[12] To except a debt from discharge for conversion, a creditor must show that: (1) the debtor committed a wrongful and intentional act; (2) the act necessarily caused injury to the creditor; (3) the act was without just cause or excuse; and 4) the debtor acted with the specific intent to cause injury to the creditor or knew or believed injury to the creditor was substantially certain to occur as a result of the debtor's actions.[13] Willfulness can be proven by direct evidence of specific intent to harm the creditor or its property, or by indirect evidence that the debtor knew of the creditor's rights and that her conduct will cause some particularized injury or that injury was substantially certain to occur.[14] The term "malicious" requires proof that the debtor either intend the resulting injury or intentionally take action that is substantially certain to cause injury.[15] Recklessly or negligently inflicted injuries are insufficient to meet the

---

[10] *See Kawaauhau v. Geiger*, 523 U.S. 57 (1998).

[11] *Panalis v. Moore (In re Moore)*, 357 F.3d 1125, 1129 (10th Cir. 2004).

[12] *Mitsubishi Motors Credit of America, Inc. v. Longley (In re Longley)*, 235 B.R. 651, 657 (10th Cir. BAP 1999).

[13] *See Geiger*, 523 U.S. at 61-64.

[14] *Longley*, 235 B.R. at 657.

[15] *Moore*, 357 F.3d at 1129.

requirements under § 523(a)(6). Malice may be implied where the preponderance of the evidence establishes that the debtor committed acts that were "wrongful and without just cause."[16]

AVB alleges that Stephen's transfer of collateral was intended to hinder its collection of its state court judgment. It also alleges that Elsie assisted in this effort. The Court finds that AVB did not establish by a preponderance of the evidence that Elsie willfully and maliciously injured AVB and/or its collateral. The allegations are that Elsie either actively assisted Stephen in concealing or converting AVB's collateral, or that she knew about Stephen's actions but failed to inform AVB, thus participating in the concealment. The evidence presented does not support AVB's allegations. There was no evidence that Elsie actively assisted Stephen in removing the collateral. There was no evidence that she knew he planned to remove the collateral. There was no evidence that Elsie assisted Stephen in converting collateral. Instead, the evidence established that Elsie did not learn of the removal until after it occurred, which was after the receiver learned about it and began the process of recovering AVB's collateral. Her failure to inform AVB of something it already knew may have been intentional, and she may have known that removal could harm AVB, but her explanation of why she did not inform AVB was understandable and with just cause under the facts. There was no evidence that Elsie Costigan acted with an intent to harm AVB. Her actions or inactions certainly did not arise to the level of being malicious, and were insufficient to meet the conduct required to except a debt from discharge under § 523(a)(6).

---

[16] *See In re Jennings,* 670 F.3d 1329, 1334 (11th Cir. 2012).

**Conclusion**

AVB Bank failed to sustain its burden of proving that Elsie Costigan's debt should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2), (4) or (6). A separate judgment in favor of Defendant Elsie Marie Costigan shall be entered contemporaneously herewith.

###